**TRANSPORTATION DISPLAYS INCORPORATED, et ano., Plaintiffs,**

v.

**Marc WINSTON, et al., Defendants.**

**No. 94 Civ. 5980 (LAK).**

United States District Court, S.D. New York.

Dec. 14, 1994.

Edward M. Spiro, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, for plaintiffs.

Andrew J. Levander, Adam B. Rowland, Shereff, Friedman, Hoffman & Goodman, L.L.P., New York City, for defendants.

### *OPINION*

KAPLAN, District Judge.

In 1986, plaintiff American Media Network, Inc. ("American") purchased all of the issued and outstanding shares of plaintiff Transportation Displays Incorporated

("TDI") from defendants and others in a leveraged buyout. The matter is before the Court on defendants' motion for partial summary judgment awarding them the sum of $628,890.71, which represents refunds of taxes originally paid by defendants pursuant to a tax indemnity clause of the Stock Purchase Agreement between the parties, but which allegedly have been converted by plaintiffs. The motion, which rests primarily on admissions contained in the complaint, is granted in substantial part.

## Facts

American purchased the shares of TDI pursuant to an agreement dated September 29, 1986 (the "Stock Purchase Agreement"). (Cpt. ¶ 9) Section 10.1 of the Stock Purchase Agreement provided in relevant part that the defendants and the other selling shareholders would indemnify and hold harmless American and its assignees from, *inter alia*, tax liabilities "as of December 31, 1985." (*Id.* ¶¶ 9–10; Levander Aff. Ex. A)

At some point, the Internal Revenue Service commenced an audit of TDI for the years 1980 through 1985. Litigation among the parties to this action broke out in 1989, but was settled in 1991. As part of the settlement, the defendants and two other selling shareholders (the "Indemnitors") reaffirmed the tax indemnity contained in the Stock Purchase Agreement and assumed control of the IRS audit. (Cpt. ¶¶ 12–15; Levander Aff. Ex. B)

In March 1993, a tentative settlement of the IRS audit was reached for the tax years 1977 through 1983. TDI consented to the assessment of taxes as proposed by the IRS and agreed to by the Indemnitors. The Indemnitors thereupon paid the IRS $1,875,049 in payment of the agreed upon $468,049 liability for taxes as well as interest calculated by the Indemnitors of $1,407,000. (Cpt. ¶ 16)

The settlement was not finally approved by the IRS until May 1994, at which point it calculated the interest due. Evidently concluding that too much interest had been paid, the IRS issued a series of refund checks to TDI (the tax filer) in the aggregate amount of $620,890.71. (*Id.* ¶ 17) TDI thereupon put the money received as a result of the Indemnitors' payment into its own, albeit allegedly separate, bank account. (*Id.* ¶ 18) It is this money that defendants seek to recover.[1]

TDI argues that it is entitled to hold onto this money, principally on the theory that defendants may have future obligations to indemnify TDI for tax liabilities:

- TDI points out that the IRS has issued a deficiency in tax in the amount of $933,721, subsequently reduced to $750,000, and certain additions thereto in respect of TDI's taxable year ended December 30, 1986 (the "1986 Federal Tax Exposure"), although it concedes that TDI is contesting that assessment in the United States Tax Court. (Cpt ¶ 21; Rudenstein Aff. ¶ 27) *If* TDI fails to overturn the deficiency creating the 1986 Federal Tax Exposure, defendants may be obliged to indemnify them. Defendants deny any liability with respect to this claim.

- TDI "has been billed approximately $63,000 in allegedly indemnifiable legal and accounting fees in connection with the 1986 Federal Tax Exposure." (Rudenstein Aff. ¶ 31) *If* TDI pays those fees,[2] and *if* plaintiffs prevail on their argument with respect to defendants' alleged liability for the 1986 Federal Tax Exposure, defendants would be obliged to indemnify plaintiffs for those expenses.

- The IRS has indicated that there will be certain restricted interest payable with respect to 1984, but the amount of the charge is now unknown.

- On November 7, 1994—after defendants filed this motion—plaintiffs paid a total of $51,617 to state and local taxing au-

---

1. Defendants' motion, as noted, seeks $628,890.71. The sum of the refunds acknowledged in the complaint, however, is $620,890.71. While we assume that the $8,000 difference is the result of a typographical error, there is no basis in the record for concluding that defendants are entitled to the higher sum.

2. I note that plaintiffs carefully avoid stating that they have paid all or, for that matter, any part of this amount.

thorities for additional tax liabilities allegedly resulting from the agreed-to federal adjustments for 1980–83. In addition, they expect additional future liabilities of about $34,500 to state and local tax authorities. (Rudenstein Aff. ¶¶ 33–34)

Thus, even plaintiffs do not claim that there was any debt due and owing from the defendants to the plaintiffs at the time this motion was brought except perhaps some legal fees with respect to the disputed 1986 Federal Tax Exposure. So plaintiffs—faced with the temptation placed in their path by the fortuity of the refund checks being directed to TDI—resorted to self-help in order to create a fund to secure defendants' future performance of their indemnity obligations.[3] The question is whether they had any legal basis for doing so.

### Discussion

The second and third claims for relief in defendants' counterclaim seek (a) a judgment declaring that plaintiffs are obliged immediately to pay them at least $620,890 in refunds, and (b) damages for plaintiffs' conversion of those funds. This motion seeks partial summary judgment for recovery of the money.

Here there is no question whatever that the $620,890.71 in refunds belongs to the defendants. It was the defendants who erroneously paid it to the IRS, not TDI.

■ As defendants point out, the indemnitor's obligation to indemnify exists only to the extent of the indemnitee's liability to third parties. Where the indemnitee's liability is contingent or unliquidated, the indemnitor is not liable. Indeed, the liability ordinarily does not arise until the indemnitee pays the third party. *See, e.g., Bay Ridge Air Rights, Inc. v. State of New York*, 44 N.Y.2d 49, 53–54, 404 N.Y.S.2d 73, 74–75, 375 N.E.2d 29, 30–31 (1978); *Rubain v. City of New York*, 182 A.D.2d 583, 582 N.Y.S.2d 435 (1st Dept.1992); *Chrysler First Financial*

*Services Corp. v. Chicago Title Insurance Co.,* 156 Misc.2d 814, 820, 595 N.Y.S.2d 302, 306 (Sup.Ct.Nassau Co.1993).

■ The agreements between the parties modified these principles to the extent of obligating the Indemnitors to (a) pay certain state and local tax liabilities directly to the taxing authorities and (b) deliver to TDI a check payable to the IRS following any IRS demand for payment. (Levander Aff. Ex. B ¶¶ 4–6) They did not, however, create, or authorize plaintiffs to create, an indemnity fund in plaintiffs' possession. Indeed, under the agreements, TDI never has any right to hold funds payable pursuant to the indemnification obligation, much less any right to create a "reserve." What plaintiffs bargained for was an unsecured contractual promise to indemnify for certain expenses—and no more.

In these circumstances, plaintiffs' effort to characterize defendants' denial of any responsibility for any liability that may be imposed upon TDI in connection with the 1986 Federal Tax Exposure as an anticipatory breach of contract is quite beside the point. There unquestionably is a lively dispute on that matter. At bottom, however, the existence of that dispute means only that defendants have a contingent liability to plaintiffs on that matter as well as others. And what plaintiffs bargained for, even assuming they are right, is defendants' *unsecured* obligation to pay when, as, and if the contingent liability becomes fixed and liquidated. That possibility does not alter defendants' right to possession of their money in the meantime.

Two questions remain: (1) whether plaintiffs should be permitted to offset against the sum due the $51,617 paid by them on or about November 7, 1994 to various state and local taxing authorities, and (2) whether a Rule 54(b) certificate should be entered or some other form of relief granted in order to give defendants an immediately enforceable right to the money. Neither question warrants extended discussion.

---

**3.** Nor would it be surprising if plaintiffs concluded that diverting over $600,000 might improve

their bargaining position with respect to the dispute over the 1986 Federal Tax Exposure.

■ There is no reason on this record to question that plaintiffs in fact paid the $51,617 and that they quite likely are entitled to be indemnified for those payments. Defendants concede as much, stating that they are prepared to reimburse plaintiffs in that amount once plaintiffs substantiate the payments as defendants have requested. In these circumstances, one is tempted to permit plaintiffs to offset the $51,617 against their immediate liability to the defendants. To do so, however, would reward their resort to self-help. As noted above, the bargain plaintiffs made involved an *unsecured* indemnity agreement. To permit such an offset, at least when plaintiffs have yet to substantiate the payments or their indemnifiability, would be to give them security for the reimbursement of whatever part of these payments are indemnifiable, if not more. In consequence, the Court will not permit an offset. If the defendants' liability for this amount, or some part of it, is established promptly, that liability can be applied in partial satisfaction of the judgment.

■ That brings us to the form of relief to be granted. In our view, defendants are entitled to the entire $620,890.71 immediately, irrespective of possible future liabilities to the plaintiffs. Giving them anything less would be inconsistent with the terms of the transaction between the parties and would defeat their legitimate contractual expectations. As defendants point out, one of the aspects of the bargain was that defendants would have the unfettered right to invest or dispose of their funds up to the moment that they become liable to the plaintiffs on the indemnity. A refusal to enter a final and enforceable judgment would deprive them of that right.[4]

■ Rule 54(b), Fed.R.Civ.P., provides that the Court may direct the entry of final judgment as to fewer than all of the claims or parties in an action upon an express determination that there is no just reason for delay. This motion conclusively determines the dispute between the parties as to the right to possession of the tax refund payments. There are, to be sure, other disputes between the parties, notably the dispute over defendants' alleged obligation to indemnify with respect to the 1986 Federal Tax Exposure. Still other disputes may arise as circumstances evolve. But none of these other disputes involves the same issues as those presented here. Given the severability of the merits of the dispute over possession of the tax refunds, the lack of any significant interrelationship between the other issues in this lawsuit and that question, and the manifest inequity of allowing the plaintiffs to seize defendants funds and then to use this litigation as a vehicle for retaining security to which they are not entitled, the Court concludes that there is no just reason for delay.[5] The Clerk will enter judgment in favor of defendants and against plaintiffs in the amount of $620,890.71 with interest thereon

---

**4.** The Court has considered the fact that a money judgment, even with a Rule 54(b) certificate, would not be enforceable immediately. Rule 62(a), Fed.R.Civ.P., provides for an automatic stay of enforcement of a money judgment until the expiration of ten days after its entry. Plaintiffs, moreover, would be entitled as a matter of right to a stay pending appeal by giving a supersedeas bond. Fed.R.Civ.P. 62(d). Thus, if plaintiffs appeal and choose to give a supersedeas bond, defendants will not recover the money until disposition of the appeal. In that event, defendants will have eliminated or dramatically reduced the credit risk, i.e., the risk they now run that plaintiffs will be unable to pay them the sum due. But they still would be deprived of the use of their money pending the appeal. Interest on the judgment ordinarily compensates a prevailing party for that loss. In another case, and on a proper showing, a court might conclude that the availability of interest in the event of affirmance would not be an adequate remedy for the interim loss of the use of the funds as, for example, where the prevailing party's business would be likely to fail absent immediate use of the funds. Accordingly, an injunction requiring immediate payment might be appropriate in a very rare case and, if granted, could be stayed pending appeal only in the discretion of the trial court or the Court of Appeals. Fed.R.Civ.P. 62(a); Fed.R.Ap.P. 8. Suffice it to say for present purposes that defendants have made no such contention or showing.

**5.** The existence of plaintiffs' other claims does not preclude the entry of judgment pursuant to Rule 54(b). *E.g., Curtiss–Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 9, 100 S.Ct. 1460, 1465–66, 64 L.Ed.2d 1 (1980).

at the rate of 9 percent from July 15, 1994 to the date of the judgment.[6]

SO ORDERED.

---

6. This is a diversity case, and New York law controls with respect to prejudgment interest. N.Y. CPLR 5001(a) provides that interest "shall be recovered upon a sum awarded because of ... an act or omission depriving or otherwise interfering with ... possession or enjoyment of, property ..." with such interest being discretionary with the court in equitable actions. Interest accrues, in circumstances such as these, from the date of each refund check on the amount of that check or, alternatively, on the entire amount from a single reasonable intermediate date. *Id.* 5001(b). Since plaintiffs admit receiving the refunds in several payments during July 1994, the Court fixes July 15 as a reasonable intermediate date. The statutory rate of interest is 9 percent. *Id.* at 5004. While the Court regards this as an action at law in which prejudgment interest at the 9 percent rate is a matter of right, we note that we would fix award prejudgment interest at the same rate if the action were characterized as equitable.